**AARON RENTS, INC., et al.**

v.

**UNITED STATES of America.**

Civ. A. No. 77–1102A.

United States District Court, N. D. Georgia, Atlanta Division.

Sept. 19, 1978.

Harold E. Abrams, G. Kimbrough Taylor, Jr., Charles R. Beaudrot, Jr., Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for plaintiffs.

William L. Harper, U. S. Atty., Barbara A. Harris, Asst. U. S. Atty., Atlanta, Ga., Gerald B. Leedom, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## ORDER

RICHARD C. FREEMAN, District Judge.

This is a case of first impression, involving the meaning of the "lodging" exception to the Internal Revenue Code investment tax credit provision. The plaintiffs, Aaron Rents, Inc., Aaron Sells, Inc., and MacTavish Furniture Industries, Inc. [hereinafter collectively "Rents"] filed this action challenging under 28 U.S.C. § 1346(a)(1) a denial by the Internal Revenue Service of their claim for a refund. The Service, upon audit of Rents' 1972 and 1973 tax returns, disallowed credits claimed for the 1969 through 1973 fiscal years totaling approximately $81,000. These amounts represented expenditures incurred during the fiscal years 1972 and 1973 for tangible personal property which, the plaintiffs allege, qualifies for the investment tax credit of Section 38 of the Internal Revenue Code. The parties are in accord that there exists no genuine issue of material fact and the action is before the court on cross motions for summary judgment pursuant to Rule 56, Fed.R. Civ.P. For the reasons set forth below, we GRANT IN PART and DENY IN PART the motions of both sides.

The detailed facts underlying this case are not in dispute and are contained in a stipulation filed by agreement of counsel on February 16, 1978. We review briefly, however, the pertinent facts upon which our holding rests.

Aaron Sells, Inc. and MacTavish Furniture Industries, Inc. were wholly owned subsidiaries of Aaron Rents, Inc. during the fiscal years ending March 31, 1972 and March 31, 1973 [hereinafter the 1972 and

1973 years]. The three companies filed consolidated corporate income tax returns with the Internal Revenue Service in Chamblee, Georgia. Rents' claims for refunds, filed in December 1976 and August 1977, were based solely on transactions undertaken by Aaron Rents, Inc.

At all times during the 1972 and 1973 years, Aaron Rents engaged in leasing residential furniture, office furniture, and party and sickroom supplies and equipment from outlets located in Atlanta, Georgia, and other cities. Aaron Rents also sold some of the items that it had formerly held for lease.

During the 1972 and 1973 years, Aaron Rents acquired various items of tangible personal property for use in its leasing business. Approximately 80 percent of this property [hereinafter the "subject property"] consisted of residential furniture. The total cost of the subject property was $5,217,144.00.

Aaron Rents leased all of the subject property under one of two arrangements. Under the first plan, the property was leased by owners or operators of apartment houses. These customers would place property in apartments that they would then rent "furnished" to their tenants. Alternatively, Aaron Rents would lease furniture directly to tenants of apartment houses or other types of lodging facilities.

During the tax years in issue, Aaron Rents received approximately 32 percent of the total gross rentals attributable to the subject property from owners or operators of apartment houses. Virtually all of the remaining 68 percent were received from tenants who leased the property directly from Aaron Rents.

All of the subject property was placed in "lodging" facilities, as that term is ordinarily used or as it is used in Internal Revenue Code § 48(a)(3). At no time was Aaron Rents, or its subsidiaries, in the business of providing "lodging."

Based on their purchase of tangible property in the 1972 and 1973 years, the plaintiffs claimed a total investment tax credit of $97,113.00 on their 1972 federal tax return and $150,623.00 on their 1973 return. When the Internal Revenue Service audited the plaintiffs' 1972 and 1973 returns, it disallowed the portion of the credit attributable to Aaron Rents' purchase of the subject property. Based on the disallowance, the Commissioner determined deficiencies for the plaintiffs' 1969 through 1973 years totaling $116,445.00. The plaintiffs paid the deficiencies, which, together with interest, amounted to $147,395.62.

Section 48(a)(3) of the Internal Revenue Code provides:

Property used for lodging.—Property which is used predominantly to furnish lodging or in connection with the furnishing of lodging shall not be treated as section 38 property. The preceding sentence shall not apply to—

(A) nonlodging commercial facilities which are available to persons not using the lodging facilities on the same basis as they are available to persons using the lodging facilities,

(B) property used by a hotel or motel in connection with the trade or business of furnishing lodging where the predominant portion of the accommodations is used by transients, and

(C) coin-operated vending machines and coin-operated washing machines and dryers.

Both sides agree that, absent this provision, the subject property would qualify as "Section 38 property" and that the investment credit would be applicable to sums expended for its purchase. The issue before the court is therefore whether the subject property was "property which is used predominantly to furnish lodging or in connection with the furnishing of lodging" when it was purchased by Aaron Rents for use in its leasing arrangements. The plaintiff contends that the lodging exclusion applies only to taxpayers who are in the business of "furnishing lodging." Since the plaintiffs are not in the business of furnishing lodging, but rather are engaged in the business of renting furniture, they are not, they contend, subject to the exclusion. The

Government argues that the exclusion operates regardless of the taxpayer's business, so long as the property is an "integral part of the furnishing of lodging."

■■■ The parties' arguments derive not only from the language of the statute, but also from an array of regulations, cases, and excerpts of legislative history. Finding no one factor conclusive, we will review the various indicia of the meaning of this admittedly ambiguous provision in hopes of discerning a balance of the evidence favoring a principled resolution of the question. Our conclusion will be that the exclusion applies regardless of whether Aaron Rents is in the business of providing lodging, and that where the furniture is leased to persons who provide lodging to their tenants it is covered by the exclusion. We therefore GRANT summary judgment in the Government's favor as to that portion of the disputed property. We also hold, however, that furniture leased directly to apartment occupants does not fall under the exclusion, and that as to that property Rents is entitled to summary judgment.

## THE LANGUAGE OF THE STATUTE

Both sides have devoted a good deal of space in their briefs, to an underlining battle, in which the goal is to convince the court to read the statute with the "proper" emphasis. The Government underlines the words, "in connection with . . .." By so doing, it attempts to highlight what it argues is the extremely broad coverage of the statute. So long as there is some furnishing of lodging going on that can be related to the subject property, the Government contends, the exclusion applies.

Rents submits that the Government has underlined the wrong part of the statute. According to Rents, the emphasis belongs on the words, "with the furnishing." By reading the statute in this manner, Rents argues, we will perceive that its authors "deliberately focused upon the activity of furnishing lodging as the disqualifying event in Section 48(a)(3) and not . . . upon who may ultimately make use of the property."

■■ The arguments of both sides each carry some persuasive impact; neither, however, is wholly convincing and in conjunction they result in a standoff. A more productive approach, we think, starts with an inquiry into how the statute works. Section 48(a)(3) defines eligible property based on the use to which the property is put. Indulging, ourselves, in the now-familiar underlining exercise, we note that the provision begins, "property which is used [in a certain manner] shall not be treated as section 38 property." The way in which the statute operates is to define a particular class of property, and the definition is based neither on the activity of the property's purchaser, nor even per se on the kind of property; rather, the definition rests squarely upon the use made of the property. From this fact we draw a negative implication: by gearing the operation of the provision to the property's use, the drafters apparently were not concerned with whether it was the taxpayer or someone else who actually used the property in the described manner. So long as someone made use of the property in the way depicted by the statute, the exclusion should apply.

This implication, drawn from the mechanics of the statute, is the first indicator that Section 48(a)(3) applies to property that Aaron Rents leased to persons who themselves furnished lodging. Under this scheme, we believe, the use to which property was put was in connection with the furnishing of lodging. The landlords furnished their tenants with a roof over their heads, heat, and running water; at the same time, and for similar purposes, they supplied Aaron Rents' furniture. We do not, however, find the words of the statute to be conclusive. While they do create a presumption in the court's mind, we must review other indications of the section's meaning to determine whether they support or overcome this presumption. In addition, while our examination thus far has tended to undermine part of Rents' position, it also supports another of Rents' contentions: that under no circumstances can that por-

tion of the property leased directly to occupants of lodging facilities be covered by Section 48(a)(3). We agree that where none of the persons involved in a leasing agreement with Aaron Rents is engaged in the furnishing of lodging, the furniture cannot be said to be "used . . . in connection with the furnishing of lodging." None of the materials we review subsequently alters this conclusion, and Rents is entitled to summary judgment with respect to the directly-leased property.

## THE REGULATIONS

Treasury Regulation § 1.48–1(h)(1)(ii) provides:

Property which is used predominantly in the operation of a lodging facility or in serving tenants shall be considered used in connection with the furnishing of lodging, whether furnished by the owner of the lodging facility or another person. Thus, for example, lobby furniture, office equipment, and laundry and swimming pool facilities used in the operation of an apartment house or in serving tenants would be considered used predominantly in connection with the furnishing of lodging. However, property which is used in furnishing, to the management of a lodging facility or its tenants, electrical energy, water, sewage disposal services, gas, telephone service, or other similar services shall not be treated as property used in connection with the furnishing of lodging. Thus, such items as gas and electric meters, telephone station and switchboard equipment, and water and gas mains, furnished by a public utility would not be considered as property used in connection with the furnishing of lodging.

■ Rents goes to considerable lengths to convince the court that this regulation is inapplicable, or, if applicable, is invalid because it expands the scope of the underlying statute. We need not determine the validity of the regulation because we agree

that it is inapplicable. We do not believe that property used "in the operation of a lodging facility or in serving tenants" means property placed in the separate apartments of the tenants for their personal use. This expression refers rather to equipment used by the management to perform such tasks as renting apartments and maintaining the building, and to property used in common areas of the building.

■ The regulation does, however, offer further support for the proposition that the use to which particular property is put governs its susceptibility to the lodging exclusion. First, it twice mimics the phrase, "property which is used," and thereby suggests that those words are a particularly significant part of the section. Second, it "waives" the exclusion with respect to certain property that is owned by taxpayers—in general, utility companies—clearly not in the business of furnishing lodging. The effect of this "waiver," combined with the fact that it seems to be based on circumstances other than whether the taxpayer is in the lodging business, strongly suggests that the drafters of the regulations considered that it would not be sufficient for the owners of this property merely to point to the fact that they are not in the lodging business in order to avoid Section 48(a)(3); that rather, it was necessary to furnish these taxpayers with an explicit exception, based here on the fact that the property was used to provide utility services.[1]

■ A third indication from the regulation that Section 48(a)(3) is keyed to the use of the property rather than the business of the taxpayer comes from the clause, contained in the first sentence quoted above, "whether furnished by the owner of the lodging facility or another person." If read, as we believe it should be, to modify the word "property," it suggests that Section 48(a)(3) will apply to property owners not in the lodging business. Rents contends that the clause in fact modifies the word

---

1. The "exception" to Section 48(a)(3) for utility-type property also supports our reading of the legislative history of the tax credit provisions that the credit was intended primarily to generate growth in industrial production.

"lodging." They point out that it directly precedes "lodging" and suggest that the word "furnished" is a code word that is always combined with the word "lodging."

It is true that good grammar requires that a clause follow immediately the word it modifies. The difficulty is that the sentence makes sense only if the clause is read to modify "property." This reading is particularly logical in that in all of the examples given the property is of a type that could be owned either by the person furnishing the lodging or by an outsider. Moreover, the word "furnished" is not restricted to accompanying the word lodging. In the last sentence of the regulation, it refers to "items."

Thus, Treasury Regulation § 1.48–1(h)(1)(ii), while not actually governing, provides additional support for our "functional use" interpretation of Section 48(a)(3). In addition to this regulation, we find other statutory and administrative provisions suggesting the same conclusion. We turn to these next.

### COMPARABLE PROVISIONS

A sure indication that Congress did not intend that Section 48(a)(3) apply only to taxpayers in the business of furnishing lodging is the fact that it has explicitly shown such an intent in other, closely related, areas. I.R.C. § 46(a)(8)(D) states:

> Railroad property defined.—For purposes of this paragraph, the term "railroad property" means section 38 property used by the taxpayer directly in connection with the trade or business carried on by the taxpayer of operating a railroad (including a railroad switching or terminal company).

Again, this investment credit provision is definitional; here, however, the property's definition encompasses the use made of it by the taxpayer in his own business. Similarly, Section 46(a)(9)(D) reads:

> Airline property defined.—For purposes of this paragraph, the term "airline property" means section 38 property used by the taxpayer directly in connection with the trade or business carried on by the taxpayer of the furnishing or sale of transportation as a common carrier by air subject to the jurisdiction of the Civil Aeronautics Board or the Federal Aviation Administration.

In both instances these sections state explicitly what Rents believes Section 48(a)(3) says implicitly. Congress obviously knows how to write the rule both ways, and unless we assume the most casual draftsmanship, we can only conclude that the distinction has been made intentionally.

Comparable regulations also provide a basis for comparison, either by focusing on the identity of the taxpayer or the entity using property for which a credit is claimed. Thus Treas.Reg. § 1.48–1(j) provides:

> Property used by certain tax-exempt organizations. The term "section 39 property" does not include property used by an organization (other than a cooperative described in section 521) which is exempt from the tax imposed by chapter 1 of the Code. . . .

Treasury Regulation § 1.48–1(k) states:

> Property used by governmental units. The term "section 39 property" does not include property used by the United States, any State (including the District of Columbia) or political subdivision thereof, any international organization . . . or any agency or instrumentality of the United States, of any State or political subdivision thereof, or of any such intentional organization. . . .

Once again, we perceive the apparently intentional use of factors not present on the face of Section 48(a)(3) or its corresponding regulations. We draw the negative implications accordingly.

### LEGISLATIVE HISTORY

The parties have debated at considerable length the purposes underlying the legislation that enacted and continued the investment tax credit. Rents argues that Congress' goal was a broad one. According to Rents, the investment credit provisions of the Revenue Act of 1962 (the enacting leg-

islation) were designed to generate growth in the American economy on an extremely broad basis. As such, the credit was to be made available to investors in all tangible property except property for which benefits could be claimed from the complementary mechanism of accelerated depreciation. From this, Rents argues that the furniture business falls easily within the large area encompassed by the investment credit.

The Government paints a much narrower picture of legislative intent. It contends that the tax credit was and always has been aimed primarily at fostering investment in domestic production facilities. There is no reason, the Government argues, to extend Section 48(a)(3) in this case because Rents was never a candidate for investment credit benefits.

Our independent review discloses, among a bevy of often inconsistent goals, a predominant theme of aiding U. S. production facilities. By way of example, we quote the following excerpts from the House and Senate Reports on the 1962 Revenue Act.

A. *Reasons for provisions*

The President in his tax message to Congress last year urged the adopting of a tax incentive in the form of a credit against tax liability for certain types of investment. He renewed this request this year in both his budget message and his Economic Report.

In his Economic Report the President states—

We must scrutinize our tax system carefully to insure that its provisions contribute to the broad goals of full employment, growth, and equity.

He indicates that his legislative proposals in the tax field are directly related to these goals and the corollary need for improvement in the balance of payments. He further states:

The centerpiece of these proposals is the 8-percent tax credit against tax for gross investment in depreciable machinery and equipment. The credit should be retroactive to January 1, 1962. The tax credit increases the profitability of productive investment

by reducing the net cost of acquiring new equipment. It will stimulate investment in capacity expansion and modernization, contribute to growth of our productivity and output, and increase the competitiveness of American exports in world markets.

H.R.Rep. No. 1447, 87th Cong., 2d Sess. 7 (1962).

The objective of the investment credit is to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic potential of the country, with a resultant increase in job opportunities and betterment of our competitive position in the world economy. The objective of the credit is to reduce the net cost of acquiring new equipment; this will have the effect of increasing the earnings of new facilities over their productive lives and increasing the profitability of productive investment. It is your committee's intent that the financial assistance represented by the credit should itself be used for new investment, thereby further advancing the economy. Only in this way will the investment credit fully serve the overall national interest in greater productivity, a healthy and sustained economic growth, and a better balance in international payments.

S.Rep. No. 1881, 87th Cong., 2d Sess. 11–12 (1962); U.S.Code Cong. & Admin.News 1962, pp. 3297, 3314.

Similarly, the Conference report states:

It is the understanding of the conferees on the part of both the House and the Senate that the purpose of the credit for investment in certain depreciable property, in the case of both regulated and non-regulated industries, is to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential by reducing the net cost of acquiring new equipment, thereby increasing the earnings of the new facilities over their productive lives.

H.R.Rep. No. 2508, 87th Cong., 2d Sess. 14 (1962); U.S.Code Cong. & Admin.News 1962, p. 3734.

The same theme is echoed nearly a decade later, during revision of the tax credit depreciation rules:

> As indicated in the discussion of the reasons for the bill, the committee concluded, as did the House, that the 7-percent investment credit should be restored as a means of providing stimulus to the lagging domestic economy by reducing the cost of capital to U.S. manufacturers. This will also serve to place them in a more competitive position with foreign manufacturers and in that manner help improve our present serious balance-of-payments situation.

S.Rep. No. 92–437, 92d Cong., 1st Sess. 24 (1971); U.S.Code Cong. & Admin.News 1971, pp. 1825, 1931.

All of the above, of course, is of tangential benefit at best. It tends to suggest a spirit in which we should read Section 48(a)(3), but gives no direct guidance as to the meaning of the words of the section. The legislative materials contain little commentary on the Section itself and tend only to mimic the statutory language. For instance, the House report accompanying the 1962 Revenue Act states:

> There also are certain categories of property which are excluded from the definition of section 38 property and, therefore, cannot qualify for the credit. These exclusions are:
>
> (1) Property used predominantly to furnish lodging or in connection with the furnishing of lodging. However, there are two exceptions to this exclusion. First, property used in nonlodging commercial facilities (such as a restaurant) located in lodging facilities (such as a hotel) may qualify for the credit if the nonlodging commercial facilities are available for use by the general public on the same basis as for the lodgers. Second, guests may qualify for the credit. The first of these two rules is essential to place nonlodging commercial facilities located in an apartment building, etc., on an equal competitive basis with similar facilities located elsewhere. The allowance of the credit in the case of a hotel or motel also is used in a regular commercial venture and, therefore, it was believed that it too should be eligible for the investment credit.

This excerpt does contain information relevant on another point. Throughout its briefs, Rents emphasizes the fact that Aaron Rents is involved in an ordinary commercial activity requiring purchases of tangible personal property as do other ordinary businesses. Rents argues that the lodging provision excludes from the broad class consisting of such businesses, persons engaged primarily in the furnishing of lodging because these persons already benefit from accelerated depreciation on real property. If the correct statutory distinction is to be based either on: (1) whether the taxpayer's income is generated primarily from real property on which accelerated depreciation is available; or (2) some differentiation between a "residential" and a "regular commercial" business, then it would not be in keeping with the spirit of the statute to apply the lodging exclusion to Aaron Rents. It is a mere matter of coincidence, Rents argues, that the property it purchases and leases out goes into homes, and if the inquiry be into whether Aaron Rents is in the "residential" business or is operating a "regular commercial venture," it is clear that Aaron Rents will fit the latter characterization.

The final sentence quoted above from the House Report supplies support for Rents' theory. If the reason hotel and motel property is left out of the lodging exclusion is that they are "regular commercial ventures," it is also reasonable to suppose that Aaron Rents' property should also be left out, and clearly Congress has here (1) made inquiry beyond the mere use of the property, and (2) provided investment credit benefits to a business outside of the area of industrial production.

We are unpersuaded that Congress' justification for the hotel and motel regulation ought to alter our reading of Section 48(a)(3). The fact that it refers to a small exception specifically written into the stat-

ute suggests that it is less than a governing principle of construction applicable to the entire exclusion. Moreover, the preponderance of the materials already reviewed suggests that it is still an aberration from the rule that the exclusion applies based on the use to which the property is put. We therefore concede a variation in the legislative pattern, but decline to turn the exception into the rule.

## APPLICABLE CASE LAW

Neither the parties nor our own efforts have uncovered a single case directly on point. Each side has succeeded in convincingly distinguishing the cases cited by the other; we believe that the issue before us has not been previously decided.

One decision of the United States Tax Court, however, bears indirectly on this case. In *Mandler v. Commissioner*, 65 T.C. 586 (1975), the petitioners were shareholders of a subchapter S corporation in the business of operating coin-operated laundry equipment. The equipment was installed in apartments, houses and trailer parks and made available to both tenants and the public generally.

Both sides in *Mandler* agreed that the equipment fell within the scope of Section 48(a)(3) as "used predominantly to furnish lodging or in connection with the furnishing of lodging," and further agreed that Reg. § 1.48–1(h)(1), which specifically cites laundry facilities as covered by Section 48(a)(3), was on its face also applicable.[2] The dispute centered on whether the petitioner could avoid the lodging exclusion by resort to Section 48(a)(3)(A), which excepts "nonlodging commercial facilities which are available to persons not using the lodging facilities on the same basis as they are available to persons using the lodging facilities. . . ."

The striking circumstance in *Mandler* is that neither the petitioner, who relied exclusively on Section 48(a)(3)(A), nor the court, which found for the petitioners on that issue, ever thought to raise the theory that Rents places before this court. There is no indication that any party to the dispute believed that the petitioner could avoid the lodging exclusion on the grounds that their corporation was not in the business of furnishing lodging.

We are again dealing in negative inferences. It is impossible to say to what degree, if any, either the court or the parties considered or evaluated Rents' theory. We ought not to penalize Rents for what others thought to do or not to do in another case. Nonetheless, the argument would seem so readily applicable to that case that we cannot help but note its absence.

## CONCLUSION

The parties have advanced a number of secondary arguments, each one constructed to demonstrate that its proponent's interpretation of Section 48(a)(3) is the more reasonable one and, therefore, the one Congress must have intended. Both sides attempt to show how the other's interpretation would lead to illogical results. The Government contends that there is no rational basis for denying the investment credit to the taxpayer whose business is furnishing lodging, while giving it to the taxpayer whose business is doing something else.

In response, Rents points out that regardless of the plan under which its furniture is leased, there is no difference in its *ultimate* use, which remains personal consumption. Taken together, both sides' arguments demonstrate nicely that the Internal Revenue Code can never be entirely consistent. Otherwise, the arguments do no more than cancel each other out.

Finally, Rents contends that a test focusing upon the business activity of the taxpayer rather than the functional use to which each item of property is put would be far simpler to administer. That basing the applicability of the exclusion on the proper-

---

2. The petitioner also claimed, however, that Section 48(a)(3)(A) precluded application of Reg. § 1.48–1(h)(1).

74

ty's use leads to complications is in fact demonstrated by our own holding, which draws what is a rather fine distinction between different pieces of Aaron Rents' furniture.

Rents may be correct in this instance, since the parties have stipulated that Rents does not furnish lodging. Nevertheless, we think that an inquiry into the taxpayer's business could in other cases be quite as complex as the one we make today. More importantly, even if Rents' scheme were clearly superior, we may not adopt it simply for that reason. We remain convinced that it is not the scheme Congress wrote into Section 48(a)(3); and in any event administrative simplicity can hardly be said to be the dominant theme of our tax code.

We conclude that I.R.C. § 48(a)(3) applies to that part of the subject property that was leased to persons who placed the property in lodging furnished to others. We further conclude that Section 48(a)(3) does not apply to the subject property leased directly to tenants of apartments. The plaintiffs are therefore entitled to receive that portion of the amount prayed for in the complaint corresponding to their expenditures for furniture leased under the latter plan,[3] plus interest thereon.

Accordingly, the cross-motions for summary judgment are each GRANTED IN PART and DENIED IN PART. The Clerk of Court shall enter final judgment in this action, subject to the right of either party, within ten (10) days of the date of this order, to bring to the court's attention any failure to agree on the dollar amount presently due the plaintiffs.

IT IS SO ORDERED.

---

**3.** The parties have stipulated that 68% of Aaron Rents' gross receipts for rental of the subject property were attributable to the direct leasing plan. The record does not indicate whether this same percentage applies to the amounts expended for *purchase* of the property. It is possible that Aaron Rents' leasing rates were not the same under the two plans, and that therefore the 68%–32% figures do not represent the actual split in the amount of property rented under each plan.